## LIBERTY OIL CO. v. CONDON NAT. BANK et al.

(Circuit Court of Appeals, Eighth Circuit. July 9, 1923.)

No. 5642.

**1. Assignments for benefit of creditors ☞246—Law of state where land situated governs validity.**

On question as to validity of deed made by assignee for benefit of creditors and marketability of title thereunder, the law of the state where the land is situated controls.

**2. Property ☞9—Presumption that possession follows legal title.**

There is a presumption of law that possession follows the legal title.

**3. Limitation of actions ☞72(1), 74(1)—Infancy and insanity held "disabilities," within meaning of statute.**

Within Gen. St. Kan. 1915, § 6906, permitting one under legal disability when cause of action to recover real property accrues to bring action within two years after disability is removed, infancy and insanity are "disabilities."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Disability.]

**4. Vendor and purchaser ☞130(2)—Bare possibility does not render title doubtful, when evidence amounting to moral certainty shows no doubt exists.**

While title likely to expose vendee to litigation is not marketable, bare possibility that title may be affected does not render the title doubtful, when highest evidence of which the nature of the case demands and amounting to moral certainty is produced that no such cause exists, as the doubt must at least be reasonable.

**5. Assignments for benefit of creditors ☞249—Possibility of action affecting title under deed by assignee for creditors held not to render title unmarketable.**

Action affecting title to land conveyed by assignee for creditors with authorization of Colorado court in which estate was being administered, but without authorization from court of Kansas in which the land was situated, could only be instituted by assignee or trustee, and, if brought more than 15 years after execution of the deed, during which all parties acquiesced and property greatly increased in value, would be barred by laches and limitations, under Gen. St. Kan. 1915, § 6905, and hence possibility thereof does not render title unmarketable.

**6. Assignments for benefit of creditors ☞250—Creditor not entitled to maintain action to cancel deed.**

Creditor alone could not maintain action to cancel deed made by assignee for benefit of creditors, because made without authorization from court of Kansas, where the land was situated.

**7. Assignments for benefit of creditors ☞249—Possibility that creditor of one making assignment may have been insane, and not barred from attacking deed, held not to render title unmarketable.**

Where assignee for benefit of creditors, with authorization from Colorado court in which estate was administered, but without authorization from court of Kansas, conveyed land in Kansas, bare possibility that some creditor may have been insane, and hence that his right to attack the deed may not be barred by limitations, does not render title unmarketable, when it is not shown that any creditor filed his claim by guardian.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suit by the Liberty Oil Company against the Condon National Bank,

in which certain other parties intervened. From a decree for the interveners, plaintiff appeals. Affirmed.

See, also, 271 Fed. 928.

The facts are correctly stated in the briefs of counsel, and are as follows:

"The suit grows out of a contract for the purchase of some leases of oil lands in Butler county, Kan., by the appellant, the Liberty Oil Company, from the interveners, the Atlas Petroleum Company, C. M. Ball, Isadore Litman, P. G. Keith, and J. H. Keith. The price agreed to be paid was $1,150,000, of which $100,000 was deposited in the bank to be held in escrow, to be paid to the interveners if they furnished the appellant with "an abstract of title of said property showing good and marketable title to said property vested in said second parties (interveners) free and clear of all liens, incumbrances, claims and indebtedness," etc. The appellant was to have 7 days to examine the title, and, if the examination showed that the title was not good and marketable, the interveners were to have a reasonable time, not exceeding 30 days, to perfect the same. If the title was good and marketable and the contract carried out, the appellant was, to pay the balance of the purchase price to the bank. If the title shown was a good and marketable one, and the appellant did not pay the balance of the purchase price, the $100,000 was to be delivered by the bank to the interveners "as liquidated damages," and the contract was to "become null and void." If the title was found to be not good and marketable as to all of the property, and it was not perfected within 30 days, it was stipulated that "the $100,000 shall be returned to the first party [appellant] and this contract shall become void," etc.

The appellant objected to the abstract of title furnished by the interveners within the time stipulated, as not showing a good and marketable title, and thereupon the interveners undertook to obviate the objections made; but the appellant insisted that the abstract as supplemented did not show a good and marketable title, and demanded of the bank a return of the money deposited with it. The bank refusing this demand, the appellant brought suit against it to recover the money, filing a petition at law therefor in the District Court of the United States for the District of Kansas. The bank filed answer, alleging that the interveners also claimed the money; that it had no interest in the controversy, but was a mere stakeholder; and prayed that the interveners be brought into the suit and be made to set up their claim therein. The bank offered to pay the money to whomsoever the court might direct.

The interveners were made parties and directed to set up whatever claim they had to the money. They at once appeared, and later made answer and cross-petition, alleging the sufficiency of the abstract of title furnished by them, and claiming the money as belonging to them as liquidated damages for breach of the contract of purchase by the appellant. The appellant filed answer to the cross-petition of the interveners, denying their contentions, and asserting its right to the money, because the abstract of title furnished was not a good and marketable title.

Upon the issues thus joined the case was tried as between all the parties mentioned. There was a single question presented: Whether or not the title furnished is a title that complies with the contract executed between these parties. There is no charge on the part of anybody of bad faith or anything of that kind, but purely a question as to whether the title furnished was the title required by the contract, and, if it was, the money belongs to the seller, Keith and his associates; if that title was not furnished, then, of course the money belongs to the oil company.

The land, title to which objection was made by appellant, is a part of the northwest quarter of section 31, township 26, range 5, east. The abstract of title showed that in 1889 this land was owned by Julius M. Turner. No question is made as to his title. May 21, 1889. Turner executed a mortgage on this land to Crippen, Lawrence & Co. for $1,200. On the same day he ex-

ecuted a mortgage on the same land, also to Crippen, Lawrence & Co., for $150. This mortgage was junior to the larger one. The junior mortgage was foreclosed and the land sold and conveyed by sheriff's deed to J. E. Putnam, his heirs and assigns, the deed bearing date March 20, 1893. September 21, 1893, J. E. Putnam conveyed the land to Stephen H. Standart, assignee, by a deed which recited that Crippen, Lawrence & Co. had made a deed of assignment of all their property, real and personal, to Stephen H. Standart, as assignee, of Denver, Colo., for the benefit of their creditors, the deed being dated September 18, 1893, and filed for record on the same day in the office of the clerk and recorder of Arapahoe county, Colo. The legal title to the land in question appears of record in J. E. Putnam, but he holds it in trust for Crippen, Lawrence & Co., who have requested him to convey this legal title to said Stephen H. Standart, as assignee, as aforesaid. So in consideration of $1 and pursuant to the request of Crippen, Lawrence & Co., he conveys the land and all his title and interest therein to Standart, as assignee, subject, however, to such incumbrances as appear of record.

This is followed by a certificate or affidavit by G. S. Richards, of date March 1, 1897, to the effect that on September 23, 1893, she was deputy clerk, and at the date of the affidavit was the clerk, of Arapahoe county, and that on October 14, 1893, Stephen H. Standart filed in the clerk's office of said county his inventory and bond as assignee of Crippen, Lawrence & Co. and duly qualified as such assignee. The bond was in the sum of $620,000. August 31, 1894, Standart, assignee, conveyed the land to Benjamin Jenkins for the consideration of $125, subject to a mortgage of $1,200. July 11, 1896, Jenkins for the consideration of $80 conveyed the land to J. J. Crippen, trustee, subject to a mortgage to Crippen, Lawrence & Co. of $1,200. On October 14, 1896, there was filed a release in consideration of full payment of the mortgage for $1,200 executed by Turner to Crippen, Lawrence & Co. on May 21, 1889. The release is by "Crippen, Lawrence & Co., by J. J. Crippen, partner." February 19, 1902, J. J. Crippen, trustee and J. J. Crippen and wife, H. F. Crippen, for $1 and other considerations, conveyed the land to H. M. McConnell.

The partnership of Crippen, Lawrence & Co. was composed of Joseph J. Crippen, Henry J. Crippen, and Henry J. Putnam, and were engaged in business in Denver, county of Arapahoe, state of Colorado. This copartnership made an assignment for the benefit of their creditors. This assignment was to Stephen H. Standart, dated and filed September 18, 1893. Standart qualified as such assignee on the 14th day of October, 1893.

Prior to the 16th day of December, 1892, Julius H. Turner and wife, the then owners of the property in controversy, had made a certain mortgage for the sum of $150 to Crippen, Lawrence & Co., which had been foreclosed, and the foreclosure ripened into a sheriff's deed for the property to J. E. Putnam, who took the legal title to the land for the benefit of Crippen, Lawrence & Co., which deed was dated March 20, 1893, and filed for record on the 25th day of March, 1893. On the 21st day of September, 1893, J. E. Putnam by his separate and independent conveyance, deeded this property to "Stephen H. Standart, as assignee." In the deed he acknowledged that he held the naked legal title for Crippen, Lawrence & Co., and at their request he conveyed it to their assignee Standart. This deed from J. E. Putnam to Stephen H. Standart was filed for record September 30, 1893.

On August 31, 1894, for a consideration of $1,325, S. H. Standart, assignee, deeded the property to Benjamin Jenkins. The consideration for this deed was the assumption and agreement of Jenkins to pay a certain $1,200 mortgage on the property and the cash consideration of $125. J. J. Crippen succeeded Stephen H. Standart as trustee, and on July 11, 1896, Benjamin Jenkins and wife deeded the property herein in controversy to J. J. Crippen, trustee. On February 19, 1902, J. J. Crippen, trustee (who, either as successor in trust to Stephen H. Standart, or by virtue of the deed from Benjamin Jenkins and wife, was undoubtedly the owner of the legal title to said property), deeded this property to H. M. McConnell. No question has ever been raised by the appellant in this case over the transfer from J. J. Crippen, trustee, and J. J. Crippen and wife, H. F. Crippen, to H. M. McConnell.

The records do not show that any of the creditors or debtors of Crippen, Lawrence & Co. were minors, lunatics, or persons suffering under any disability, and do not show that any guardian or conservator or any other person acting in any representative capacity was appointed by the court and appeared in said proceeding in connection with the administration of said estate. The assignment was not fully administered by Standart, an arrangement having been made in 1895 under which J. J. Crippen was appointed trustee to close up matters. Standart was discharged as assignee by the Colorado court in 1899, but before this time, and while he was in active charge of the estate, the deed from Standart, as assignee, to Jenkins was made.

The appellant, through its attorneys, made objection to the abstract of title, as follows: "In the chain of title to the south half of lot 1, lot 2 of the S. E. ¼ of the N. W. ¼ of section 31, township 26, range 5, there appears at entry No. 42 of the abstract a deed made by S. H. Standart, assignee, who it appears from other instruments connected with this title was the assignee for the benefit of the creditors of Crippen, Lawrence & Co. This deed is made to Benjamin Jenkins. No showing is made in the abstract and nothing appears in the records of a proper order of sale made by the district court of Butler county, Kan., as is required by law in a valid conveyance of this character. This deed is ineffective as a conveyance of title, and the source of title of C. R. Nuttle is dependent upon the deed as a conveyance of title. The title acquired by the assignee, so far as the records show, still remains in him. This title will have to be acquired in order to make a merchantable title to the property in question, and also to make such a title to the oil and gas rights to this property."

The District Court rendered a decree in favor of the interveners, from which the appellant has appealed to this court.

F. W. Lehmann, of St. Louis, Mo. (Harry E. Karr, of Baltimore, Md., and Charles G. Yankey, of Wichita, Kan., on the brief), for appellant.

John J. Jones, of Chanute, Kan. (J. H. Keith, of Ironton, Mo., and Hugo T. Wedell, of Chanute, Kan., on the brief), for appellees.

Before LEWIS and KENYON, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge (after stating the facts as above). Both parties agree that the sole controversy is over the validity of the deed from S. H. Standart, assignee of Crippen, Lawrence & Co., to Benjamin Jenkins, executed on August 31, 1894, and filed for record in the proper office of the register of deeds of Butler county, state of Kansas, on September 25, 1894, and duly recorded, and the deed of J. H. Crippen, who succeeded Standart as trustee under the assignment to H. M. McConnell, executed on February 19, 1902, and duly filed for record in Butler county, Kan., on September 15, 1902. These conveyances were authorized and approved by the court of the state of Colorado in which the assignment was administered, and the land in controversy had been listed by the assignee as a part of the estate of his assignors. On behalf of appellant it is claimed that these deeds are absolutely void, not having been approved by the district court of Butler county, Kan., the county in which the land was situated, as required by the laws of the state of Kansas, and for that reason the title offered by interveners to appellant is not a marketable title, as provided in the contract between the parties.

To remedy this alleged defect, which interveners denied to be a defect, they procured and had recorded quitclaim deeds executed in June, 1918, from H. J. Putnam, one of the partners of Crippen, Lawrence & Co., who made the assignment to Stephen H. Standart, and from the sole heirs of J. J. Crippen, the other member of that partnership. J. H. Crippen having executed the deed to H. M. McConnell, no quitclaim was necessary from him.

[1] As the land is situated in the state of Kansas, the law of that state, as construed by its Supreme Court, no doubt controls. This is not controverted by counsel for appellees, nor is it disputed that under the statutes of that state a sale of lands lying in that state, held by an assignee for the benefit of creditors under an assignment, executed and administered in the court of another state, can only be made on an order by and with the approval of a court of competent jurisdiction of the state of Kansas. Thompkins v. Adams, 41 Kan. 38, 20 Pac. 530; Watson v. Holden, 58 Kan. 657, 50 Pac. 883; McNutt v. Nellans, 82 Kan. 424, 108 Pac. 834. This action was instituted August 1, 1918, within a few days of 24 years after the execution of the deed. Ex parte affidavits were presented to the court at the hearing, showing that the parties under whom the interveners claim title had been in open, notorious, and continuous possession under the deeds now attacked in this case for over 20 years.

[2, 3] Leaving out of consideration these affidavits, there is a presumption of law that possession follows the legal title. The first deed having been executed by Standart to Jenkins in 1894, and the deed from Crippen, trustee, successor to Standart in the assignment, on February 19, 1902, more than 15 years have elapsed since those under whom the interveners claim title are presumed to have been in possession under their deeds. The statute of limitation of Kansas for the recovery of real property is 15 years. Section 6905, Gen. Stat. of Kansas 1915. Section 6906 of the statute permits one entitled to bring an action for the recovery of real property, who may be under legal disabilities when the cause of action accrues, to bring his action within 2 years after the disability is removed. Infancy is, of course, a disability, within the meaning of section 6906, and so is insanity, and has been so held by the Supreme Court of Kansas. Lantis v. Davidson, 60 Kan. 389, 56 Pac. 745.

The sole question now to be determined is: Was the title of the interveners to the land in controversy a marketable title? In 39 Cyc. 1454, a marketable title is defined as:

"The rule that the title must be free from reasonable doubt does not require a title absolutely free from all suspicion or possible defect, but only requires a title which a reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such transactions, be willing to accept and ought to accept. The fact that in the action between the vendor and the purchaser the court may consider the title good does not render it marketable. In the absence of an express stipulation therefor a marketable title does not mean a title which satisfies the purchaser or which his attorney pronounces marketable."

Maupin on Marketable Titles, § 284, defines it as:

"Where the probability of litigation ensuing against the purchaser in respect of the matter in doubt is considerable; or, as it was put by Alderson, B., where there is a 'reasonable decent probability of litigation.' The court, to use a favorite expression, will not compel the purchaser to buy a lawsuit. If there be any reasonable chance that some third person may raise a question against the owner of the estate after the completion of the contract, the title will be deemed unmarketable."

Again on page 769 that author says:

"It is impossible in the nature of things that there should be a mathematical certainty of a good title. Such a thing as absolute security in the purchase of real estate is unknown. But a bare possibility that a title may be affected from certain causes, when the highest possible evidence of which the nature of the case admits, amounting to a moral certainty, is given that no such cause exists, does not render the title doubtful. The purchaser cannot demand a title absolutely free from all suspicion or possible defect; nor that he be guaranteed against any trouble on account of the title. He can simply require a title such as prudent men, well advised as to the facts and their legal bearings, would be willing to accept. The doubts must be such as will affect the market value of the estate. They must not be made up for the occasion, based on captious, frivolous, and astute niceties; they must be such as would induce a prudent man to hesitate in accepting a title affected by them. What matters of law or what matters of fact are sufficient to make a title so doubtful as to be unmarketable cannot be indicated by positive rules. Facts or questions which present no difficulties to one judicial mind may, in the opinion of another, raise insuperable objections to the title. It is obvious that the existence of a 'fair and reasonable doubt' as to the title must depend upon the capacities of the judge to whom the question is addressed. 'Practically the judge acts upon his own doubts.' It has been said that the title which a purchaser will be required to take should be, like Cæsar's wife, free from suspicion, but that the purchaser will not be relieved on account of possibilities of defects, or mere suspicions of faults ending only in suspicion. The doubt must be 'grave and reasonable.'"

[4, 5] It is true that a title which is likely to expose the vendee to litigation is not a marketable title; but, as shown by authorities above cited, the fact that there is a bare possibility that a title may be affected, when the highest evidence of which the nature of the case demands, amounting to a moral certainty, is given that no such cause exists, does not render the title doubtful. The doubt must be at least reasonable. In this case who can question the title of the interveners? It is claimed on behalf of the appellant that any creditor of Crippen, Lawrence & Co. can maintain an action affecting the title.

We cannot sustain this contention. Such an action could only be instituted by the assignee or trustee appointed by a court of competent jurisdiction. As the assignee or trustee has been discharged over 18 years, it would be necessary to apply to the court in Colorado in which the assignment proceedings were pending to open up the estate and appoint an assignee, with directions to institute proceedings in the proper court in Kansas. But in such an action he would be clearly barred by the statute of limitations and laches, if the suit is instituted in a court of equity, as it would likely be to cancel the assignee's and trustee's deeds.

More than 15 years having elapsed since the execution of the deeds, it would be barred by the statute of limitations of the state of Kansas.

But, even if the full period of limitation had not yet attached, a court of equity is not always bound to follow the statute. They are not bound to do so, if the result would be inequitable. This would apply with great force to the facts in the instant case. The evidence establishes that at the time the land was sold by the assignee in 1894 its value was $1,325, while in view of the discovery of oil on the premises they have become very valuable. Under the contract in the case at bar the oil lease, which is subject to the payment of one-eighth of the price obtained for the oil as a royalty to the owner of the fee, is valued at several hundred thousand dollars. The fact that the sale was made by the assignee so long ago and approved by the court, although a court without jurisdiction, and that all the parties in interest, the assignors as well as the creditors, have acquiesced in it and never questioned it, would prevent any one from raising objections now. In Mitchell v. Green, 125 Minn. 24, 145 N. W. 404, it was held (quoting from the headnotes):

"Where the assignee, under an assignment for the benefit of creditors, made a sale of real estate, in which all parties in interest acquiesced, the discharge of the assignee by the court, on the ground that he had fully performed his trust, will be deemed an approval of such sale, as against an objection raised more than 10 years later by a stranger to both the assignment proceedings and the title."

In that case the record failed to show approval by the court of the sale made by the assignee. See, also, Estate of Potter & Page, 54 Pa. 465; Bole v. McKelvy, 189 Pa. 505, 42 Atl. 42.

[6] It is contended that some of the creditors may be minors or insane persons, and therefore under disability, within the meaning of the statute of limitations of Kansas. A creditor alone could not maintain an action to cancel the deed of the assignee and trustee. Assuming that such creditors should want proceedings to attack the title of the land instituted, such an action would not affect the title of interveners, for several reasons. That there can be no minors who can complain as creditors under the assignment is beyond question, the assignment having been made on September 18, 1893, nearly 30 years ago, and the final settlement and account of the trustee, as successor of the original assignee, in which the money received for the land in controversy was accounted for, was approved by the Colorado court, in which the administration was pending on March 14, 1905, and the trustee discharged. As the substituted assignee or trustee would only possess the rights of his predecessors, he would certainly be barred. All the facts were known to his predecessors. There was no fraud practiced by any one; there was no concealment of facts; the most that could be claimed was that the parties, in ignorance of law, failed to have ancillary proceedings in a court of Butler county, Kan., and an order from that court to make the sale.

[7] That there may be a bare possibility that some creditor of the estate might have been at the time an insane person cannot be considered as reasonable. If there had been such a creditor, his claim would have had to be filed by a guardian, and, if that had been done, it would have been an easy matter to have established it from the files

of the proceedings in the Colorado court in which the estate was administered.

The authorities mainly relied on by counsel for appellant are Wesley v. Eells, 177 U. S. 370, 20 Sup. Ct. 661, 44 L. Ed. 810, and Canaday v. Miller, 102 Kan. 577, 171 Pac. 651. In our opinion neither of them are in point. Wesley v. Eells was an action for specific performance, and the court held that the granting of specific performance is discretionary and will be denied if inequitable. The facts in that case were: It had been decided by one of the trial courts of South Carolina, the state in which the lands in controversy were situated, that the title to land from the state paid for with a certain scrip of that state, which had been illegally issued and therefore invalid, was absolutely void. This, the court held, created such a doubt as to the title that it might work an injustice to the purchaser. The court said:

"Again, it is a settled rule of equity that the defendant in a suit brought for the specific performance of an executory contract will not be compelled to take a title about which doubt may reasonably exist or which may expose him to litigation. * * * And, speaking generally, a title is to be deemed doubtful where a court of co-ordinate jurisdiction has decided adversely to it or to the principles on which it rests."

Canaday v. Miller was also an action for specific performance. The contract in that case provided that the title was to be satisfactory to the vendee. The court held:

"While this would not justify a captious refusal or arbitrary objection to the title, an objection to the title based on the opinion of able lawyers that the title is not merchantable under the laws of Arkansas, where the land in dispute is situated, is not arbitrary."

Plaintiff's title in that case rested on 7 years' payment of taxes under color of title, under the laws of the state of Arkansas, and a decree of confirmation of his title by a chancery court of that state. That decree was not on personal service, but on publication of a warning order. Under the laws of Arkansas, such a decree is not final, but may be opened within 3 years. Less than one year had elapsed at the time the suit was instituted, and the court held, and no doubt properly, that the decree of confirmation was not yet impervious to attack, and was in effect only interlocutory, and therefore plaintiff's title was not such as would justify the court to grant specific performance.

In our opinion, the decree was right, and must be affirmed.